[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15102
_____

D.C. Docket No. 0:18-cr-60167-DMM-3

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STEPHEN CHALKER,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 13, 2020)

Before WILSON, MARCUS, and THAPAR,[*] Circuit Judges.

MARCUS, Circuit Judge:

This appeal follows a four-day jury trial of Stephen Chalker, formerly the pharmacist-in-charge at Pop's Pharmacy in Deerfield Beach, Florida. Chalker challenges his convictions for healthcare fraud and conspiracy to commit healthcare fraud. He cites a host of trial errors, which broadly fall into three groups: (1) one challenge to the sufficiency of the evidence and one to the sufficiency of the indictment; (2) two others to the district court's admission of lay and expert witness testimony; and (3) one to the trial court's refusal to grant a continuance. He also raises one sentencing claim. After thorough review, and having the benefit of oral argument, we affirm.

I.

On June 14, 2018, a federal grand jury sitting in the Southern District of Florida indicted Christopher Liva, Elaina Liva, and Stephen Chalker, charging each of them with one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349. The indictment alleged that the three co-defendants conspired to submit and cause to be submitted false and fraudulent claims to Medicare, TRICARE, and Medicaid. The indictment also charged Chalker alone

---

[*] Honorable Amul R. Thapar, United States Circuit Judge for the Sixth Circuit, sitting by designation.

with three substantive counts of healthcare fraud, in violation of 18 U.S.C. § 1347. Both Christopher and Elaina Liva pled guilty to the conspiracy charge.  On November 1, 2018, the district court sentenced Elaina Liva to 24 months in prison, and on November 14, 2018, the district court sentenced Christopher Liva -- who testified against Chalker at trial -- to 48 months in prison.  Eight of those months run consecutively to a 78-month sentence that had been imposed on Liva in the Northern District of Ohio for an unrelated healthcare fraud and money-laundering conspiracy.

These are the essential facts adduced at Chalker's trial.  In late 2014, Christopher Liva decided to purchase a pharmacy in Deerfield Beach, Florida.  He tapped Chalker to be the pharmacist-in-charge.[1]  The two had met while working for another pharmacy.  Chalker found Pop's Pharmacy, or Pop's, on Craigslist, and Liva bought it from its then-owner, Priti Dubal.  But Liva and Chalker had a problem.  At the time of Liva's purchase of Pop's Pharmacy, he was under investigation for healthcare fraud in Ohio.  And Liva and Chalker didn't want to risk upsetting Pop's Pharmacy's contracts with its pharmacy benefit managers ("PBMs"), who work with insurance companies to develop their lists of covered drugs and contract with pharmacies to process prescription claims.  After all, if a

---

[1] The pharmacist-in-charge is the pharmacist "responsible for a particular pharmacy entity" -- "responsible for making sure the pharmacy is compliant with . . . state laws and regulations" and "responsible for the claims being billed at that particular pharmacy and dispensed to patients."

3

PBM were to learn that Pop's Pharmacy's new owner was under investigation for healthcare fraud, it would surely stop doing business with the pharmacy. So Liva named his mother, Elaina, as the majority owner of Pop's.[2] He asked Chalker to leave him off all emails with PBMs. And when Chalker submitted recertification paperwork to Express Scripts, one of Pop's Pharmacy's PBMs, Chalker falsely named himself as Pop's Pharmacy's owner and affirmed that no owner of Pop's had been the subject of "criminal prosecution including fraud."

Even though Pop's was a community pharmacy, which would typically fill prescriptions for chronic conditions like hypertension or diabetes, under Chalker's direction, Pop's almost exclusively filled prescriptions for topical compounded medications. Chalker would run "test claims" to see if PBMs would reimburse for certain prescriptions. To entice patients to accept prescriptions, Chalker -- who "had the final say regarding" co-payment policies at Pop's -- would routinely waive co-payments. To further boost their business, Liva and Chalker paid telemarketers to solicit patients and schedule them for interviews with doctors via telemedicine.[3] Chalker created pre-printed prescription pads that Pop's shared

---

[2] Liva listed his mother as owning 95% of Pop's Pharmacy, and he left former owner Priti Dubal as a five-percent owner of the business.

[3] "Telemedicine" refers to a clinical "relationship [that] is remote," where typically, a patient speaks to a provider using either video or another form of communication technology.

4

with its network of telemedicine doctors.  Chalker went so far as to create a script for telemarketers to use when speaking with patients.

These practices led to a dramatic spike in business at Pop's Pharmacy.  The pharmacy went from billing CVS Caremark, for example -- one of its PBMs -- a couple hundred dollars one week to around $40,000 the next.  Indeed, Pop's Pharmacy's plan worked too well at times; Liva and Chalker would have to occasionally "slow down" billing for prescriptions to avoid "raising some red flags."  Pop's also received frequent complaints from patients, who said they didn't want, need, or know anything about the drugs they were receiving.  Pop's soon started hearing from auditors, too, who had noticed red flags at the pharmacy.  One of them, Jennifer Thomas, an investigator with CVS Caremark, received a tip and commenced an audit of Pop's Pharmacy's claims in December 2014.  Thomas's audit revealed that Pop's had submitted bills in a few instances even when it didn't have enough drugs in stock to fill those prescriptions.  Thomas learned that there had been unauthorized prescription refills; prescriptions were refilled "several more times without the physician knowing," "going above and beyond what the original prescription allowed."  And Thomas concluded that Pop's was "not collecting high dollar copayments."

CVS Caremark was not alone.  Express Scripts found that Pop's Pharmacy had $670,000 in what it called "purchase verification shortages" -- discrepancies

between the drugs Pop's billed and those it had ordered from wholesalers. Express Scripts also found one physician who denied writing prescriptions for three of Pop's Pharmacy's patients. Optum RX, a third PBM, discovered that some of its members denied receiving prescriptions for which Pop's had submitted bills. Optum also found the same practice of submitting claims for reimbursement that outstripped supply -- Optum determined that Pop's hadn't purchased enough drugs to cover seven of the claims the pharmacy had submitted. All three PBMs sought to clawback money they had paid to Pop's and decided to terminate Pop's from their networks, refusing to accept any claims from the pharmacy in the future.

Chalker quit his job at Pop's Pharmacy in late July or early August 2016 -- "one day" he just "didn't come in." Right after he left, Liva testified, "a lot of the audits came to light that weren't being attended to and the reversals and the clawbacks got out of control." After leaving Pop's Pharmacy, Chalker became the pharmacist-in-charge at another local pharmacy, Happy Heart. In January 2017, however, a pharmacy investigator with America's First Choice Health Plan sent Happy Heart a fraud alert. The investigator had received several complaints from patients for both Pop's Pharmacy and Happy Heart, and she noticed that Chalker had been the pharmacist-in-charge at both of them. The investigator determined that, at both pharmacies, Chalker worked with "teletrolls" -- doctors who receive information from telemarketing companies and sign prescriptions for medically

6

unnecessary drugs.  She spoke to Chalker by phone to confirm her findings, but Chalker was "defensive" and "unusually hostile."  The investigator saw what she called "extreme similarities" between the practices at Pop's and Happy Heart. Ultimately, the investigator reversed approximately $50,000 billed on behalf of eleven beneficiaries.

Chalker's case proceeded to trial on September 4, 2018, and on September 7, the jury returned guilty verdicts on all counts.[4]  Chalker was sentenced soon thereafter.  The Presentence Investigation Report ("PSI") recommended an offense level of 29 and a criminal-history category of I, yielding a guidelines range of 87 to 108 months.  The district court sentenced Chalker to 78 months' imprisonment on all counts, to be served concurrently, followed by three years of supervised release.[5]  The court also ordered restitution in the amount of $4,980,679.50.  This timely appeal followed.

---

[4] At the outset of the trial, the government voluntarily dismissed one of the three substantive counts of healthcare fraud.

[5] At sentencing, the district court reduced Chalker's offense level from 29 to 28, finding a two-level "special skill" enhancement more appropriate than the PSI's recommended three-level "manager or supervisor" enhancement.  Accordingly, the district court calculated the guidelines range to be 78 to 97 months and sentenced Chalker at the bottom of the range.

II.

A.

We review Chalker's claim that insufficient evidence supported his convictions de novo, taking the evidence and drawing all reasonable inferences in a light most favorable to the government. United States v. Ochoa, 941 F.3d 1074, 1102 n.18 (11th Cir. 2019). The substantive healthcare fraud statute, 18 U.S.C. § 1347, says that whoever

> knowingly and willfully executes, or attempts to execute, a scheme or artifice --
>
> > (1) to defraud any health care benefit program; or
> >
> > (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a). Section 1349 "makes it unlawful to attempt or conspire to commit a § 1347 crime of health care fraud." United States v. Moran, 778 F.3d 942, 960 (11th Cir. 2015).

1.

Our review of the entire trial record satisfies us that the government introduced sufficient evidence to support Chalker's conspiracy conviction. "For a defendant to be found guilty of conspiracy, the government must prove beyond a

8

reasonable doubt (1) that the conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Nerey, 877 F.3d 956, 968 (11th Cir. 2017) (quotation omitted).  "Because the crime of conspiracy is predominantly mental in composition, the government may prove these elements by circumstantial evidence." Moran, 778 F.3d at 960 (quotation omitted).  Indeed, the "nature of conspiracy requires proof by such inferences and circumstantial evidence." Id.  Moreover, the government need not "prove that the defendant knew all of the details or participated in every aspect of the conspiracy." Id. (quotation omitted).  "Instead, the government's burden is only to prove that the defendant knew of the essential nature of the conspiracy." Id. (quotation omitted).  We will affirm a conspiracy conviction "when the circumstances surrounding a person's presence at the scene of the conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." Id. at 960–61 (quotation omitted).

The evidence adduced at trial revealed a straightforward scheme to defraud. Pop's Pharmacy, with Chalker at the helm, filled medically unnecessary prescriptions for patients who neither wanted nor needed them.  Michele Thatcher, a witness for the government and an expert in pharmacy operations, conducted a pharmacist review of Pop's Pharmacy for the period between September 22, 2014 and October 19, 2016.  Thatcher, a Doctor of Pharmacy and licensed pharmacist

with 21 years of experience, is the lead pharmacist and Medicare subject matter

expert at Qlarant, which contracts with the Centers for Medicare and Medicaid

Services to run the National Benefit Integrity Medicare Drug Integrity Contractor

("NBI MEDIC").  Her review uncovered several indicia of fraud at Pop's

Pharmacy.

First, Thatcher observed a dramatic spike in the number of prescription drug

event ("PDE") records produced by Pop's.[6]  That spike was "not consistent" with

what NBI MEDIC "typically see[s]," and it prompted NBI MEDIC to look more

closely into Pop's Pharmacy's PDE records.  Next, Thatcher found that Pop's

Pharmacy submitted reimbursement claims for a very surprising mix of drugs.  Just

three drug subclasses accounted for 92% of the pharmacy's claims.  All three of

those subclasses were topical medications, to be applied to the skin: local

anesthetics, like lidocaine; topical, nonsteroidal anti-inflammatory medications;

and topical corticosteroids.  The mix was very odd because a community

pharmacy's customers more commonly fill prescriptions for medications that treat

chronic conditions like hypertension, diabetes, or depression.  Moreover, since a

pharmacy's customers don't all present with the same conditions, Thatcher was

---

[6] As Thatcher explained, a PDE record is "a summary record" created by an insurance company "every time a Medicare beneficiary fills a prescription."  The PDE record includes the drug that was dispensed, the drug quantity, the day-supply, the prescriber, the pharmacy, and the cost.

10

extremely surprised to learn that only three drug subclasses accounted for 92% of Pop's Pharmacy's prescriptions.

Not only were Pop's Pharmacy's patients receiving the same medications, but they were also receiving them in the same quantities. Thatcher explained that this too was unusual; patients tend not "to need the exact same quantity of a topical preparation." The appropriate quantity "would depend on the area of the skin" and the condition being treated. Thus, for example, 87% of the prescriptions Pop's filled for one topical medication, diclofenac, were identical: 360 grams for a 30-day supply. What's more, Thatcher explained that to use 360 grams of diclofenac in thirty days would require covering the entire human torso, back to front, three times daily. That Pop's was filling prescriptions for the same drugs in the same amounts was made all the more unusual because those drugs were compounded medications. Thatcher explained to the jury that compounded medications are supposed to be individually tailored to meet the needs of each patient. Thatcher testified that the "premise of compounding is really specialization" and explained that "compounding is intended to be very unique and specialized for an individual patient."

Thatcher identified two more red flags. First, she testified that while the typical customer of a retail pharmacy lives nearby, 75% of Pop's Pharmacy's Medicare beneficiaries lived outside the state of Florida. Likewise, 83% of the

11

prescription drug event records were associated with prescribers located outside of Florida. And, even more remarkably, in 50% of the PDE records, the beneficiary (the patient) and the prescriber (the doctor) did not live in the same state. Second, Thatcher testified that Pop's Pharmacy's prescriptions were prohibitively expensive. The average cost of a topical compound prescription, Thatcher explained, ranges from $200 to $300. At Pop's, however, that same cost was "significantly" higher and ranged from $1,000 to $2,000.

Thatcher concluded that her findings were consistent with other fraudulent schemes she had investigated. She opined that, were she the pharmacist at Pop's, she would have been "very concerned" by any one of these red flags, much less by all of them in concert. She would have been "very uncomfortable being involved" and would have been "concerned about [her professional] license." All the more so if she were to learn that patients were complaining about their prescriptions. And still more so were she to learn that PBMs doing business with Pop's were clawing back their payments.

The jury also heard testimony from the pharmacy benefit managers' investigators who audited Pop's. Jennifer Thomas, CVS Caremark's lead senior investigator, testified that she initiated an audit after receiving a tip from a client, discovering that Pop's had gone from receiving a weekly check of "around a couple hundred dollars" to about $40,000. As a result of her audit, Thomas

12

discovered that Pop's Pharmacy was using pre-printed prescription pads and routinely waiving co-payments. Thomas requested proof of delivery from Pop's for certain prescriptions because she wanted "to make sure that the patient actually received the medication." But Pop's was not always able to satisfy this request. Thomas also sent verification letters to physicians to confirm their prescriptions. In response, Thomas received "denials from physicians stating they did not prescribe this medication for the member." Moreover, Thomas learned that many patients "would receive just one of these high dollar compounds and they were never billed again." But typically, Thomas explained, when a prescription is medically necessary, the patient continues that course of treatment; "you don't see them billed just one time and then never again."

All told, Thomas testified that CVS Caremark sought to clawback $139,727 from Pop's Pharmacy. Thomas discussed her audit findings with Chalker by phone on December 15, 2014. Chalker explained that "they just took over a few months ago" and were still ironing out a few kinks in their procedures. But CVS Caremark did not know there had been any change in ownership at Pop's. Had it learned that Pop's Pharmacy's new owner "had been charged with healthcare fraud," it would have immediately terminated Pop's from its network. Thomas testified that Chalker did not seem concerned by her audit findings; instead, he was worried only that the pharmacy's contract with CVS Caremark might be in

13

jeopardy.  Following the conclusion of Thomas's audit, CVS Caremark terminated Pop's Pharmacy from its network.

The other audits revealed more of the same.  Blake Stockwell, the senior manager of Express Scripts' pharmacy special investigations unit, testified that Pop's Pharmacy had joined its network by signing and submitting a provider agreement on October 22, 2012.  And on December 23, 2015, Pop's submitted a recertification agreement to Express Scripts.  Chalker signed on behalf of Pop's, falsely indicating that he was the pharmacy's current owner, when in truth and in fact the owner was Christopher Liva and the listed owner was Christopher's mother, Elaina.  By signing the recertification form, Chalker affirmed that each of the answers he provided was true and correct.  Thus, Chalker falsely certified that at no point during the previous ten years had an owner of the pharmacy been the subject of a criminal prosecution involving fraud.  He claimed the pharmacy had never undergone a change in ownership.  And he said that Pop's never waives or reduces co-payments.

Stockwell further testified that, had Express Scripts known Pop's Pharmacy's new owner had been charged with healthcare fraud, Express Scripts would have stopped accepting any claims from Pop's.  Stockwell launched an audit of Pop's because of a tip he received from NBI MEDIC.  Stockwell's audit revealed one physician who denied writing prescriptions for three patients, and that

14

Pop's had submitted $670,000 in claims for drugs it hadn't purchased. As a result of the audit, Express Scripts sought to clawback $769,989.45 from Pop's. Like CVS Caremark, Express Scripts terminated Pop's from its network.

The government also introduced more than enough evidence to establish that Chalker knowingly and voluntarily participated in the conspiracy. Indeed, Chalker did more than participate -- he played a leading role. Chalker's co-conspirator, Christopher Liva, admitted that he had conspired with Chalker to commit healthcare fraud. By his own admission, Chalker was responsible for running Pop's Pharmacy. Liva testified that Chalker selected the products the pharmacy would market. Chalker was also responsible for developing and producing the compounding recipes. Chalker came up with the idea of using pre-printed prescription forms that Liva would give to patient recruiters and to doctors. Liva explained that Chalker engaged in test billing: he "would test run different formulations with the insurance companies to see what was covered, what was not covered, if it was covered, what was the net profit, and if [it] wasn't high enough, we would still try to find other formularies that would reimburse higher." Once Pop's Pharmacy began using telemarketers, Chalker would provide them with scripts to use on calls with patients. Liva also testified that Pop's Pharmacy "had a very lax view on copays" and would waive them "quite often."

15

Liva directed Chalker to leave his name off the pharmacy's correspondence with its PBMs.  Liva and Chalker did not want to alert their pharmacy benefit managers that a "convicted felon" was associated with Pop's.  Chalker knew all about Liva's legal troubles; indeed, Chalker sent a character letter on Liva's behalf in connection with Liva's sentencing in Ohio.  In fact, Chalker submitted the letter on December 21, 2015; just two days later, Chalker sent in the recertification agreement to Express Scripts affirming that no owner of Pop's Pharmacy had faced criminal prosecution for fraud.

Finally, Chalker testified in his own defense.  He claimed that Pop's Pharmacy always collected co-payments.  He claimed that Pop's never  billed for medicine that it didn't have in its inventory.  He claimed that he never concealed Liva's ownership of the pharmacy.  And he claimed that he never stole from Medicare, that he never stole from TRICARE, and that he never stole from Medicaid.  When his counsel asked if Chalker had stolen from anyone, Chalker replied, "No, sir."  But the jury was entitled to, and obviously did disbelieve those denials.  We have "established that when a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication."  United States v. Vazquez, 53 F.3d 1216, 1225 (11th Cir. 1995).  Not only that -- the jury may consider a "defendant's false explanatory statement as

16

substantive evidence proving guilt." Id. (quotation omitted). This rule "applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge." Id. (quotation omitted); see also United States v. Shabazz, 887 F.3d 1204, 1220 (11th Cir. 2018) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt, particularly when the elements to be proved for a conviction include highly subjective elements like the defendant's intent or knowledge." (alteration adopted) (emphasis and quotations omitted)). In short, the government introduced sufficient evidence at trial to allow a reasonable jury to find beyond a reasonable doubt that Chalker conspired to commit healthcare fraud.

2.

We are also satisfied that sufficient evidence supports Chalker's substantive convictions for healthcare fraud. We have explained that, "in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007). "A person makes a false claim if the treatments that were billed were not medically necessary or were not delivered to the patients." United States v. Gonzalez, 834 F.3d 1206, 1214 (11th Cir. 2016) (alteration adopted and quotation omitted).

17

The jury heard from two of Pop's Pharmacy's patients and one caretaker of a Pop's Pharmacy patient. Sylvia Aguayo, the patient whose claim was the basis for Count Four of the indictment, is a Medicaid beneficiary from Tampa, Florida. She suffers from heart disease, kidney disease, and fibromyalgia. She sees a local doctor and picks up her prescriptions at a local pharmacy. Aguayo testified that she never needed any type of topical compounded medication. When she first received an unsolicited call from Pop's, she responded that she did not want the Lidocaine cream being offered. But Pop's "kept on at" her, so she ultimately gave in. When she told her doctor about the Lidocaine, however, her doctor told her she would not have prescribed Aguayo Lidocaine for any of her ailments. A Dr. Christian Mayaud, from Yonkers, New York, purportedly wrote Aguayo's prescription for the topical cream, but Aguayo testified that she had never heard of Dr. Mayaud.

Similarly, Andrea Williams, whose mother Cynthia's claim was the foundation of Count Three of the indictment, testified that her mother had used the same primary care practice in New Jersey, and the same local pharmacy, for forty years. Williams is her mother's caretaker and manages her mother's doctor's appointments and pharmacy visits. Williams testified that she discovered her mother had paid for a pain cream sent from Pop's Pharmacy. That made no sense to Williams, though; her mother did not use a pain cream, and Williams had

18

neither ordered nor received any pain cream.  So Williams called Medicare to file a complaint, reporting that her mother had not received the prescribed pain cream and that Williams had never heard of the doctor who wrote her mother's Pop's Pharmacy prescription.  That doctor, Dr. Frank Amico, practiced in Greenville, North Carolina.  Williams explained to the jury that her mother had never seen a doctor in Greenville, that she never received a phone call from a doctor in Greenville, and that there was no way Dr. Amico could have spoken to her mother without her knowing.

This evidence was sufficient to allow the jury to find Chalker guilty beyond a reasonable doubt of the substantive counts of healthcare fraud under the doctrine established by Pinkerton v. United States, 328 U.S. 640 (1946).  Under that doctrine, "a member of a conspiracy is criminally liable for the reasonably foreseeable crimes that other conspirators commit during the course of and in furtherance of the conspiracy."  United States v. Dixon, 901 F.3d 1322, 1343 (11th Cir. 2018) (ellipsis and quotations omitted).  Once the government establishes that the defendant is a knowing member of a conspiracy, "the defendant may be liable for substantive offenses committed by fellow conspirators even if he lacked knowledge thereof."  Id. at 1344 (alteration adopted) (ellipsis and quotation omitted).  "Hence, the court need not assess the individual culpability of a particular conspirator provided that the substantive crime was a reasonably

19

foreseeable consequence of the conspiracy." United States v. Silvestri, 409 F.3d 1311, 1335–36 (11th Cir. 2005) (quotation omitted).

The district court gave the jury a Pinkerton instruction without objection from Chalker. The court told the jury that, during "a conspiracy, if a conspirator commits a crime to advance the conspiracy toward its goals, then in some cases a coconspirator may be guilty of the crime even though the coconspirator did not participate directly in the crime." Thus, if the jury were to find Chalker guilty of the conspiracy charge, the court explained, it could also find Chalker guilty of the substantive commission of healthcare fraud, even if he "did not personally participate in the crime." To do so, the jury would need to find beyond a reasonable doubt that:

> (1) during the conspiracy a conspirator committed the additional crime charged to further the conspiracy's purpose;
>
> (2) [Chalker] was a knowing and willful member of the conspiracy when the crime was committed; and
>
> (3) it was reasonably foreseeable that a coconspirator would commit the crime as a consequence of the conspiracy.

Ample evidence supports Chalker's substantive convictions for healthcare fraud under a Pinkerton theory of liability. At all times, Chalker remained a knowing and willful -- indeed, a vital -- member of the conspiracy. And that Pop's Pharmacy would submit fraudulent claims as a consequence and in furtherance of this conspiracy is "virtually the definition of 'reasonably foreseeable.'" United

20

States v. Corbett, 921 F.3d 1032, 1042 (11th Cir. 2019) (emphasis in original).

Taking the evidence in the light most favorable to the government, again we are

satisfied that sufficient evidence supported Chalker's substantive healthcare fraud

convictions.

B.

Next, Chalker alleges that the district court erred in denying a pair of

motions to dismiss the indictment. Chalker says the indictment was defective

because it failed to sufficiently inform him of the charges he faced. We disagree.

While we "review the district court's denial of a motion to dismiss the

indictment for abuse of discretion," the "sufficiency of an indictment is a legal

question that we review de novo." United States v. Schmitz, 634 F.3d 1247, 1259

(11th Cir. 2011) (quotation omitted). When reviewing an indictment's sufficiency,

"we give the indictment a common sense construction, and its validity is to be

determined by practical, not technical, considerations." United States v. McGarity,

669 F.3d 1218, 1235 (11th Cir. 2011) (quotation omitted), abrogated on other

grounds as recognized by United States v. Rothenberg, 923 F.3d 1309, 1336 (11th

Cir. 2019). An indictment "is sufficient if it (1) presents the essential elements of

the charged offense, (2) notifies the accused of the charges to be defended against,

and (3) enables the accused to rely upon a judgment under the indictment as a bar

against double jeopardy for any subsequent prosecution for the same offense."

21

United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002) (quotation omitted). And when "an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." United States v. Pena, 684 F.3d 1137, 1147 (11th Cir. 2012) (quotation omitted).

Chalker's indictment was plainly sufficient. As for Count One, which charged Chalker with conspiracy to commit healthcare fraud, the indictment literally tracked the relevant statutory language. The indictment alleged that Chalker and his co-defendants conspired "to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program . . . and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services." Next, the indictment identified the purpose and object of the conspiracy. The co-defendants, the indictment charged, sought to "unlawfully enrich themselves" by "submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, and Medicaid."

The indictment also set forth the manner and means of the conspiracy in some detail. The indictment alleged that Chalker became the pharmacist-in-charge at Pop's Pharmacy in or around September 2014, and it claimed that Chalker and

22

his co-defendants took steps to conceal Liva's ownership of the pharmacy. Thus, for example, the indictment charged Chalker with "sign[ing] and caus[ing] to be submitted an Express Scripts provider certification and pharmacy disclosure form on behalf of Pop's Pharmacy in which he" failed to disclose Liva's ownership interest and "falsely and fraudulently represented" that the pharmacy's owner "had not been the subject of a criminal prosecution involving fraud." The indictment accused Chalker of causing "Pop's Pharmacy to submit false and fraudulent claims to Medicare, TRICARE, and Medicaid for compounded drugs and other prescription medications, including expensive pain and scar creams, that were not medically necessary and/or were never provided." Lastly, the indictment claimed that Chalker and his co-defendants "oftentimes did not collect copayments" to "induce beneficiaries to accept medically unnecessary medications."

Similarly, as for the substantive counts of healthcare fraud, the indictment tracked the statutory language for the criminal offense charged. The indictment expressly incorporated by reference its earlier description of Chalker's fraudulent scheme. And, for each substantive count of healthcare fraud, the indictment identified the beneficiary, the claim number, the approximate date of service, the item billed, and the approximate amount paid.

This indictment was not, as Chalker claims, "too vague to pass muster." To the contrary, the indictment "specifically referred to and tracked the language of

23

the statute on which it was based," and it "provided notice to the defendant[ ] of the charges to be defended." United States v. Wayerski, 624 F.3d 1342, 1350 (11th Cir. 2010); see also Woodruff, 296 F.3d at 1047 (explaining that it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished" (quotation omitted)). Because the indictment presented the essential elements of the charged offenses, notified Chalker of the charges to be defended against, and enabled him to plead double jeopardy in any future prosecution for the same offenses, the district court did not err in declining to dismiss it.

## C.

Next, Chalker raises two evidentiary claims that the district court erred in admitting lay and expert opinion testimony during his trial. First, Chalker says, the district court should not have permitted Julia D'Antonio to testify as a lay witness, and second, it should not have allowed Michele Thatcher to testify as an expert.

For starters, we cannot agree that the district court erred when it permitted D'Antonio, an FBI forensic accountant, to testify as a lay witness. We review a district court's admission of lay testimony only for a clear abuse of discretion. United States v. Stahlman, 934 F.3d 1199, 1222 n.10 (11th Cir. 2019). Opinion

24

testimony offered by a lay witness is governed by Rule 701 of the Federal Rules of Evidence, which limits the testimony to opinions that are "rationally based on the witness's perception"; "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "Notably, Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences." United States v. Jeri, 869 F.3d 1247, 1265 (11th Cir. 2017) (quotation omitted).

The claimed error began when, on direct, the prosecutor asked D'Antonio about her educational and professional background. D'Antonio testified that she has "two bachelor's degrees, one in business management" and "one in accounting," along with a "master's degree in forensic accounting." She also told the jury that she is "a certified public accountant, [a] certified fraud examiner and certified in financial forensics," and then she explained what those credentials mean. At that point, Chalker's counsel objected to "undisclosed expert testimony." The prosecutor responded that the government was not offering D'Antonio as an expert, and the district court permitted D'Antonio's testimony to proceed. After D'Antonio explained what she does as a forensic accountant, and after she told the jury that she was involved in the investigation in this case, Chalker's counsel asked for a "continuing objection" to D'Antonio's "[u]ndisclosed expert testimony." The

25

district court overruled this objection.  The court explained, quite accurately, that there had "not been a question that would invoke such an objection" and that "somebody can have a degree, but not be asked . . . opinion questions which would relate to being an expert witness."

The problem for Chalker is that he points to no opinion testimony offered by D'Antonio that impermissibly crossed over the line into expert testimony.  He does not, because he cannot -- D'Antonio never opined as an expert.  D'Antonio testified only briefly.  She limited her testimony to providing the jury with a summary of Chalker's bank and wage records.  At no point did D'Antonio opine about these records, much less about Chalker's conduct in this case.  Indeed, when the prosecutor asked D'Antonio whether there was "anything that looks strange" to her about the records, the district court sustained defense counsel's objection.

Nor did the district court err by admitting expert testimony from Michele Thatcher.  We review the district court's admission of expert testimony for abuse of discretion.  See Jeri, 869 F.3d at 1265.  On August 8, 2018, almost one month before trial, the government informed Chalker that it intended to call Jodi Sullivan as an expert witness.  Sullivan worked at Qlarant and NBI MEDIC and, as the government disclosed, would testify about the Medicare Part D billing process, Pop's Pharmacy's records, and compounded medicine in general.  The government's initial disclosure also informed the defendant that Sullivan would

26

testify about what's called invoice reconciliation, or discrepancies between the claims Pop's submitted to Medicare for reimbursement and the drugs it had on-hand in its inventory.

Chalker moved the district court in limine on August 24 to exclude Sullivan's expert testimony, primarily arguing that Sullivan should not be allowed to testify about invoice reconciliation because her records were incomplete. In its response to Chalker's motion on August 31, the government agreed that its expert would not testify about invoice reconciliation. The government also informed Chalker that, in place of Sullivan, it planned to call Michele Thatcher as its expert. Just like Sullivan, Thatcher had worked for Qlarant and NBI MEDIC. And, just like Sullivan, Thatcher would testify as an expert about the Medicare Part D billing process, Pop's Pharmacy's records, and compounded medicine in general.

The gist of Chalker's argument is that the government's August 31 disclosure of its new expert witness was too little and too late. But we don't think the district court abused its considerable discretion in allowing Thatcher to testify as an expert at trial. After all, the only thing that changed on August 31 was the identity of the government's proposed expert witness, and at no point has Chalker objected to Thatcher's qualifications or credentials. The government had provided Chalker with, as required by Rule 16 of the Federal Rules of Criminal Procedure, a detailed written summary of its proposed expert testimony. Indeed, as the

27

government explained to Chalker, Thatcher would testify at trial about a narrower band of topics than her predecessor would have. We "will not reverse a conviction based on a Rule 16 expert disclosure violation unless the violation prejudiced the defendant's substantial rights." Stahlman, 934 F.3d at 1222 n.10. And, on this record, Chalker cannot show that he suffered any prejudice from the government's swap of one expert witness for another.

D.

Chalker also claims the district court erred in denying his motions to continue his trial. "We review a district court's denial of a motion for continuance only for an abuse of discretion." Jeri, 869 F.3d at 1257 (quotation omitted). To prevail on this claim, Chalker "must show that the denial of the motion for continuance was an abuse of discretion which resulted in specific substantial prejudice." Id. (quotation omitted). To make that showing, the defendant "must identify relevant, non-cumulative evidence that would have been presented if his request for a continuance had been granted." Id. (quotation omitted).

Chalker cannot do so. Chalker complains that his counsel, who was appointed 74 days before trial began, lacked adequate time to prepare because the government "dumped" files and documents on Chalker "throughout the entire post arraignment period." Chalker says the government even "switched its lone disclosed expert on the very eve of trial." But these claims are not enough.

28

Chalker has not shown the "specific, substantial prejudice" we require; he "has not pointed to any specific documents or relevant, non-cumulative evidence [he] would have presented," nor is there "anything in the record that would indicate a different result had the motions been granted." United States v. Valladares, 544 F.3d 1257, 1264 (11th Cir. 2008) (per curiam) (quotation omitted).

Nor is the government's August 31 switch from one expert witness to another grounds to find an abuse of discretion. As we've discussed already, all that changed on that date was the identity of the government's proposed expert witness, rather than the subject matter or the content of the proposed expert testimony. Because Chalker "has not identified any specific documents or other non-cumulative evidence that would indicate a different outcome if [his] motions had been granted, [he] has failed to show specific, substantial prejudice." Id. at 1265 (quotation omitted). The district court did not abuse its discretion in denying Chalker's motions for continuance.

### E.

In his final challenge to his convictions, Chalker argues cumulative error. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless error) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Margarita Garcia, 906 F.3d 1255, 1280 (11th Cir. 2018) (quotation

omitted).  "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."  Id. (quotation omitted).  But because Chalker has not pointed us to any error in his trial, we are left with no errors to accumulate.[7]  So Chalker's argument that all of his claimed errors, when taken together, compel reversal necessarily fails.  See Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012) ("[W]here there is no error in any of the trial court's rulings, the argument that cumulative trial error requires that this Court reverse the defendant's convictions is without merit." (alterations adopted and quotation omitted)).

---

[7] Chalker adds an additional argument in the cumulative error sections of his briefs before this Court that he does not address elsewhere.  Chalker claims that the government improperly relied on the false assertion that federal regulations prohibit the waiver of co-payments.  But this argument, made without citation to the trial record, is unavailing.  The government did not seek to criminalize Chalker's failure to collect co-payments.  Rather, several witnesses testified that the routine waiver of co-payments is a red flag because it can "entice patients to fill prescriptions that they usually don't want."  Indeed, Liva testified that Chalker would waive co-payments to "entice patients to accept [their] product[s]."  To avoid any confusion, and at Chalker's request, the district court instructed the jury that pharmacies may "waive or reduce co-pay amounts provided they do so in an unadvertised, non-routine manner, if, after reasonable efforts to collect, they are unable to do so."  The court also instructed the jury that evidence of a civil regulatory violation "does not necessarily mean that a crime has been committed."  In no respect did testimony regarding the waiver of co-payments deprive Chalker of his constitutional right to a fair trial.

30

F.

Chalker also raises one challenge to his sentence.  He says that insufficient evidence supported the district court's calculation of the loss amount and thus, the district court improperly calculated his guidelines range.  We review the district court's interpretation of the Sentencing Guidelines de novo and its determination of loss for clear error.  United States v. Annamalai, 939 F.3d 1216, 1235 (11th Cir. 2019).  "For a factual finding to be clearly erroneous, we must be left with a definite and firm conviction that the court made a mistake."  United States v. Tejas, 868 F.3d 1242, 1244 (11th Cir. 2017) (per curiam).  Here, the district court did not err, much less clearly so, in calculating the loss amount.

"In a fraud case, the Sentencing Guidelines provide for an increase in the base offense level corresponding to the loss resulting from the offense." Annamalai, 939 F.3d at 1235 (citing U.S.S.G. § 2B1.1(b)(1)).  Because the amount of loss caused by fraud is often "difficult to determine accurately, a sentencing court can use a reasonable estimate of the loss."  Id. (quotations omitted); see also U.S.S.G. § 2B1.1 cmt. n.3(C) ("The court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based on that evidence.  For this reason, the court's loss determination is entitled to appropriate deference.").  When "the defendant objects, the government must prove its loss calculation by a preponderance of the evidence

31

using reliable and specific evidence." Annamalai, 939 F.3d at 1235 (quotation omitted). The district court can "base its loss determination on factual findings derived from, among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing." United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011) (quotation omitted).

The record reveals that Chalker did not dispute the PSI's calculation of the total loss amount before the district court. Before sentencing, Chalker filed objections to the PSI. The PSI calculated the total loss amount to be $4,980,679.50, and Chalker complained that the PSI's figure "assumes that 100% of the prescriptions provided were invalid or not effective." But Chalker sang an altogether different tune at his sentencing hearing. The government arrived ready to put on testimony as to the loss amount. After hearing opening argument from the government, the court asked Chalker's counsel if he had anything he wanted to "to present on loss amount." And counsel responded that Chalker "was not contesting the total amount." Indeed, counsel said he was "going to have to rely on" the PSI's figure.

In any event, contrary to Chalker's claim that there was "insufficient evidence" that Pop's Pharmacy's prescriptions "were medically unnecessary or never provided," the trial record amply supports the district court's calculation of

32

the loss amount.  As we've discussed, the evidence established that Chalker and Liva operated Pop's Pharmacy as a sham from the outset.  The evidence included expert testimony from Michele Thatcher that Pop's Pharmacy almost exclusively filled prescriptions for only a small mix of compounded medications, in identical amounts; testimony that physicians denied writing prescriptions for Pop's Pharmacy's patients; evidence that Chalker falsely claimed ownership of Pop's Pharmacy to hide Liva's identity from Express Scripts; evidence that Pop's submitted claims for reimbursement even when it didn't have enough drugs on-hand to fill those prescriptions; evidence that Chalker routinely waived co-payments; and testimony from patients that they neither wanted nor needed prescriptions from Pop's Pharmacy.  On this record, there was no clear error.[8]

**AFFIRMED.**

---

[8] Before the district court, Chalker claimed that the total loss amount should not be attributed to him because, by quitting his job at Pop's Pharmacy, he withdrew from the conspiracy.  The district court, relying on the trial record, found that Chalker had not withdrawn and declined to reduce the loss amount.  On appeal, Chalker does not argue this was error.  Chalker does argue, but only for the first time in his reply brief, that the district court erred by failing to make individualized findings concerning the scope of his criminal activity, see Moran, 778 F.3d at 974.  But because Chalker failed to raise this issue in his initial brief, we will not address it.  See Valladares, 544 F.3d at 1269 n.2; United States v. Magluta, 418 F.3d 1166, 1185 (11th Cir. 2005) ("[A]n appellant may not raise an issue for the first time in a reply brief.").