[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-11879

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANDREW E. FISHER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:19-cr-00076-MCR-1

_____

Before WILSON, BRANCH, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Andrew Fisher appeals his convictions for conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347, 1349; conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349; and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1957. On appeal, Fisher argues that: (1) the evidence at trial was not legally sufficient to warrant his convictions, and (2) the district court's failure to provide limiting instructions to the jury on the alleged means of accomplishing the conspiracy amounted to approving a constructive amendment of the indictment. After careful review, and with the benefit of oral argument, we affirm.

## I.    BACKGROUND

In July 2019, a federal grand jury indicted Andrew Fisher for his role in a scheme to defraud TRICARE, a federal health insurance program. Count One of the indictment charged Fisher with conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. §§ 1343, 1347, and 1349. Count Two charged Fisher with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1957.

Both charges concerned Fisher's conduct that occurred between October 2014 and December 2015 as the head of a pharmacy he opened and ran in Florida. The indictment mainly alleged that Fisher conspired to seek reimbursements from TRICARE for

fraudulent prescriptions.    According to the indictment, Fisher knew there was no legitimate doctor-patient relationship between the prescriber of the fraudulent prescriptions and the patient, yet Fisher agreed to have his pharmacy fill the prescriptions, ship the medications, and submit claims to TRICARE.  Fisher would then pay his co-conspirator a commission of approximately fifty percent of any reimbursement received for a prescription submitted to Fisher by his co-conspirator or his co-conspirator's employees.  The indictment also alleged that Fisher sought reimbursements for prescriptions, while not seeking to enforce the co-pay requirement that was part of the TRICARE contract, and that Fisher directed his employees to use needlessly expensive ingredients in compound medications to maximize the reimbursements Fisher's pharmacy could bill to TRICARE.

The parties agree that Fisher owned and operated a pharmacy that was filling fraudulent prescriptions and seeking reimbursement from a federal health insurance program called TRICARE, but Fisher claims he did not know the prescriptions were fraudulent.  The government argues that Fisher was a knowing and willing participant in the conspiracy to defraud TRICARE.

The case proceeded to a jury trial and the trial record reflects the following.[1]

---

[1] We "review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor."  *United*

### A. General Background

TRICARE is a federal medical benefits program that provides health insurance to active duty and retired military service members and their families, including prescription drug benefits. TRICARE contracts with Express Scripts, Inc., to administer its prescription drug benefits in accordance with TRICARE rules and regulations.

In its role as TRICARE's pharmacy benefits manager, Express Scripts creates and manages the network of pharmacies eligible to fill TRICARE prescriptions by contracting with those pharmacies on behalf of TRICARE. These pharmacies are called "network pharmacies." TRICARE beneficiaries who fill prescriptions at network pharmacies are responsible only for a co-pay amount, instead of the total cost of the drug. Express Scripts's network agreements state that a network pharmacy's failing to collect required co-pays may result in "immediate termination" from the network.

Once a prescription is filled, the pharmacy submits a claim to Express Scripts for reimbursement. Express Scripts, on behalf of TRICARE, reimburses the pharmacy for covered drugs, at rates established by TRICARE. Express Scripts reimburses network pharmacies by electronic transfer or check through a central payment

_____

*States v. Grow*, 977 F.3d 1310, 1320 (11th Cir. 2020) (quoting *United States v. Deason*, 965 F.3d 1252, 1262 (11th Cir. 2020)).

processor—in this case, the American Pharmacy Cooperative, Inc.—which processes and later transfers the funds to the pharmacy. TRICARE rules require that prescriptions must be made under a licensed health care practitioner's determination that the prescription is medically necessary for the beneficiary. In other words, if TRICARE or Express Scripts knew that a prescription was not written with a licensed practitioner's determination that the prescription was medically necessary, they would deny the claim.

The prescriptions at the center of this case were for "compound medications." Unlike most prescription drugs, which are premade for the pharmacy to dispense, compound medications are prepared by a pharmacy by combining different ingredients specifically prescribed by a physician for an individual patient. Thus, they are reimbursed based on each individual ingredient in the compound. Examples of compound medications include scar creams, pain creams, and combinations of vitamins.

During the relevant time, TRICARE's prescription drug benefits included payment for certain individual ingredients of compound medications, some of which were reimbursed at extremely high rates. In May 2015, TRICARE severely cut back coverage on compound medications, making compounding much less lucrative.

## B. The Underlying Conspiracy

The conspiracy Fisher joined was in motion before Fisher got involved. And the underlying conspiracy is not in dispute. It

started in 2013 when Scott Burton established a scheme with Brad Hodgson that involved submitting fraudulent prescriptions for TRICARE beneficiaries and seeking high reimbursement rates.

Burton owned a company called Simply Surgical, which employed many sales representatives working for commissions based on insurance reimbursements from compound medications. Hodgson worked as an assistant to Dr. Jeff Traub, an orthopedic surgeon with three offices in the Atlanta area.[2] Burton asked Hodgson to write prescriptions for compound medications for Burton's friends and family. These friends and family were not patients of, and never saw, Dr. Traub, but Burton told Hodgson that they had conditions requiring pain or scar creams. Because Hodgson was not licensed to prescribe medication, he first sought and received Dr. Traub's permission to write the prescriptions on Dr. Traub's behalf. But as the volume of Burton's prescriptions increased, Hodgson stopped asking Dr. Traub for permission to write the prescriptions and continued signing Dr. Traub's name. At trial, Hodgson testified that Dr. Traub knew that Hodgson was writing prescriptions for Burton, but Dr. Traub "wasn't aware of how many, how often, or where they were actually being sent."

Once the scheme got going, the process went as follows: Burton and his sales representatives would recruit people—mostly TRICARE beneficiaries—to receive prescriptions for compound

---

[2] Hodgson was an assistant to the physician, not a physician assistant, and at no time was he licensed to prescribe medication.

medications with high reimbursement rates. Burton testified that he focused on compound prescriptions for TRICARE beneficiaries because "TRICARE was one of the highest paid, the highest reimbursed" for compound prescriptions. Burton would email new "patient" information to Hodgson and another employee in Dr. Traub's office, Marie Smith. This information included the person's driver's license and insurance cards and what prescription Hodgson should write. Smith would transfer the fake patient's information to Dr. Traub's patient database to make it look like a real patient seen by Dr. Traub. Hodgson would then write the prescription, forge Dr. Traub's signature, and send it off to the pharmacy. The pharmacy in turn would fill the prescription and seek reimbursement from the insurance company.

Once the pharmacy was reimbursed, the pharmacy would pay Burton his commission, which was fifty percent of the reimbursement. Burton would then pay Hodgson $25 for every prescription that was reimbursed by the insurance company. In total, Hodgson made between $8,500 and $10,000 from the scheme. Burton paid Smith $25 per hour for her efforts, as well as kickbacks for recruiting her husband to receive these compound medications and receiving the medications herself.

As a result of this scheme, Burton pleaded guilty to conspiracy to commit the crimes of health care fraud, wire fraud, and money laundering and the substantive crime of money laundering. Hodgson pleaded guilty to conspiracy to commit health care fraud, conspiracy to commit wire fraud, and the crimes of receiving

health care kickbacks and identity theft.  Other co-conspirators pleaded guilty for their participation, including Marie Smith.

Burton, Hodgson, and Smith at first processed the fraudulent compound prescriptions through a TRICARE network pharmacy called Curant Heath.  But Curant Health was not "in" on the scheme, and in August 2014, the pharmacy began asking questions about who was writing the prescriptions from Dr. Traub's office and whether the prescriptions were for actual patients of Dr. Traub.  Around August 2014, Burton testified, Curant Health refused to accept any more prescriptions from Dr. Traub.[3]

Burton was on the hunt for another TRICARE network pharmacy to sell compound medications with, when one of his former sales representatives recommended Burton speak with Andrew Fisher.

### C.  Fisher Opens Physician Specialty Pharmacy

In September 2014, Fisher opened a pharmacy in Pensacola, Florida, called Physician Specialty Pharmacy.[4]  Fisher was not

---

[3] Burton testified that by August 2014, Curant Health would no longer accept prescriptions from Dr. Traub.  Hodgson testified that Curant Health never refused to accept Dr. Traub prescriptions, but that he and Burton made the decision to transition to another pharmacy.  Either way, it is undisputed that Curant Health had many questions about the prescriptions from Dr. Traub, and Burton wanted to work with a new pharmacy.

[4] Fisher was at least the majority owner of Physician Specialty Pharmacy through a corporate entity called Hydra Medical Ventures, which was owned

himself a pharmacist, but he held the title of President and was in charge of the pharmacy.

To get the business off the ground, Fisher and his operations manager Cary McKnight procured a building, obtained a pharmacy license, and started contracting with insurance companies. Physician Specialty Pharmacy hired pharmacists to develop and fill prescriptions, pharmacy technicians to assist the pharmacists, and patient care specialists to gather and confirm patient demographic and insurance information. Two of the pharmacy's key employees were Glenn Hanson as pharmacist-in-charge, and Vicki Cowart, who eventually became the sales representative liaison between Physician Specialty Pharmacy and its contract sales representatives.

Physician Specialty Pharmacy specialized in compound medications. When Fisher opened Physician Specialty Pharmacy, TRICARE was the last reliable insurance company paying high reimbursement rates for compound medications. Physician Specialty Pharmacy obtained contracts to fill prescriptions for the beneficiaries of several insurance companies, but not TRICARE. To access TRICARE's high reimbursement rates, Physician Specialty

---

by MedPro Wealth Builders. In turn, MedPro Wealth Builders was owned by Fisher and his wife.

Pharmacy entered into a "central fill agreement" with a TRICARE-network pharmacy in Pace, Florida, called Burklow Pharmacy.[5]

The business relationship between Physician Specialty Pharmacy and Burklow Pharmacy worked as follows: Physician Specialty Pharmacy used Burklow Pharmacy's billing system and contracts to bill for prescriptions that Physician Specialty Pharmacy received, filled, and shipped, and in exchange, Burklow Pharmacy would retain fifteen percent of the insurance reimbursements. At trial, the government asked Physician Specialty Pharmacy's vice president of pharmacy operations whether it was normal for a central fill pharmacy to receive, fill, and ship prescriptions and use the originating pharmacy to bill for the prescriptions. The witness responded, "That would not be a normal central fill agreement, no."[6] Fisher had a similar arrangement with Jay Pharmacy in Santa Rosa County, Florida.

### D. Fisher's Pharmacy Begins Filling Burton's Fraudulent Prescriptions

---

[5] Central fill agreements allow nonnetwork pharmacies to contract with network pharmacies to fill prescriptions and bill through the network pharmacy to be eligible for reimbursement.

[6] During his testimony, the witness explained how central fill agreements generally work: "A central fill agreement would be Pharmacy A received the prescriptions, does the billing, and they send the prescription to Pharmacy B to actually fill it and send it out to the patient."

When Burton and Fisher first made contact in the Fall of 2014, their two businesses were operating separately. As noted, the Burton-Hodgson conspiracy was in full swing, and Burton was looking for a new pharmacy to fill the forged Dr. Traub prescriptions. Physician Specialty Pharmacy was up and running and was filling TRICARE prescriptions for compound medications through its central fill agreement with Burklow Pharmacy.

By October 2014, the two men had spoken on the phone, played a round of golf, and come to a business arrangement: Burton agreed to market Physician Specialty Pharmacy's formulas for a fifty percent commission from the insurance reimbursements received on every prescription that Burton and his sales representatives forwarded to Physician Specialty Pharmacy. Burton would receive payments through his company, Simply Surgical, and would pay his representatives from his cut.

Importantly, Burton also testified that in the initial phone call with Fisher, Burton told Fisher about his troubles with Curant Health and that he was looking for a pharmacy that would accept prescriptions from Dr. Traub. Burton described the conversation like this:

> So I told him—he asked me why we weren't using the other pharmacy, [Curant Health,] and I said, we had a doctor, Dr. Traub, who was prescribing these pain and scar creams to patients that were friends of mine or my representatives or relatives that needed these pain and scar creams that were out of state; and that

Dr. Traub didn't actually see the patients.  And I said, Dr. Traub was okay with this, because, as Dr. Traub said, this isn't OxyContin; this is a pain – topical pain and scar cream, it's not a big deal, I have been pre-scribing to friends and family for years.

So I told Andrew Fisher that; and I said, look, is this going to be a problem at your pharmacy?  He said, as long as it's not a problem with the surgeon, I have no problem with it.

At trial, Burton was asked whether there were other times he discussed with Fisher "the fact that these prescriptions didn't have a real doctor/patient behind them"; Burton answered: "Many times."  Burton explained that because many of the patients Burton recruited were from out-of-state—and often in states that Physician Specialty Pharmacy was not licensed to dispense medications— they "would have to discuss, well, this is a patient from Dr. Traub who he didn't actually see," and the prescriptions would have to be shipped to an address in Georgia instead of the state in which the patient resided.  Evidence at trial included an email sent by Fisher to Burton asking Burton to provide a Georgia address for out-of-state prescriptions of Dr. Traub.  Burton gave his home address for shipping some prescriptions and testified that another sales repre-sentative also provided an Atlanta address for shipping prescrip-tions for out-of-state patients.

Once Burton and Fisher came to an agreement, the Burton-Hodgson scheme continued pretty much as it had before, except Burton directed Hodgson to send all of Dr. Traub's fraudulent

prescriptions directly to Physician Specialty Pharmacy, i.e., not to the TRICARE network pharmacies, Burklow Pharmacy or Jay Pharmacy. Burton and his sales representatives recruited TRICARE beneficiaries to accept compound medications without seeing Dr. Traub and sent the recruited patient information to Hodgson, who would forge the prescription and then fax the prescription from Dr. Traub's office to Physician Specialty Pharmacy.

Under Burton and Fisher's arrangement, Burton and his sales representatives distributed Physician Specialty Pharmacy's Rx pads—listing the pharmacy's products and formulas—to physicians. Burton and his sales representatives also directly recruited their friends and family members who were TRICARE beneficiaries to provide their demographic and TRICARE information and accept the compound medications prescribed by Dr. Traub, without seeing the doctor. The government provided examples at trial of individuals who were friends or family members of Burton or his sales representatives who provided their TRICARE information for this purpose. As previously noted, Hodgson would send the forged prescriptions directly to Physician Specialty Pharmacy to fill. Despite the connection between Dr. Traub's office and Physician Specialty Pharmacy, there was no evidence Fisher knew that Hodgson was forging Dr. Traub's signature; Hodgson testified that he never met Fisher or communicated with him in any way.

Each of Burton's sales representatives had a fax number linked to them, so that Physician Specialty Pharmacy would know which sales representative generated the prescription. Then,

Physician Specialty Pharmacy's patient care specialists would confirm the information. Once confirmed, they would submit the claim to the insurance company and forward the prescription to lab for filling. And once filled, the pharmacy shipped to the prescription to the patient.

### E. Fisher's Pharmacy Begins Engaging in "Gray Area" Practices

Fisher's employees at Physician Specialty Pharmacy did not know that some of Dr. Traub's prescriptions were not based on a legitimate doctor-patient relationship. Physician Specialty Pharmacy had multiple patient care specialists who were responsible for confirming whether patient information was correct. But Fisher's sales representative liaison Vicki Cowart became suspicious that something was awry in August 2015 when she received a troubling call from one of Burton's sales representatives, Doran Fortune. She sent Fisher an email describing the call:

> I received a call from Doran Fortune, a Simply Surgical rep. . . . Today he sounded worried and concerned. Doran said he has received a disturbing communication from our TRICARE patient, Mark T. Searles. Doran had personally suggested to the patient that he visit Dr. Traub while in Atlanta. We received a script for this patient from Dr. Traub and filled four items between 4/29 and 4/30/15, each as a 90-day supply and the patient had no co-pay. According to Doran, the patient never received the meds. In fact, the patient lives in Woodbridge, Virginia . . . .

[T]he patient received an EOB from TRICARE showing we billed $118,000 and TRICARE paid $95,000. Patient assumes that $23,000 is owed.  Patient is completely astounded at these amounts and feels he somehow is involved in our fraudulent billing practices through Jay Pharmacy. I confirmed through Jay PK that TRICARE should be paying us $95,599.76 for 90-day supplies of the four medications Dr. Traub submitted on his prescription. . . .

I reminded Doran that we absolutely do not participate in anything fraudulent.  I also checked the delivery information from UPS, and two packages of meds were delivered to and signed for at the condominium address in Atlanta which we were provided by Dr. Traub's office as being the patient's address.

In the same email, Cowart reported to Fisher that Doran told her about "10 of his close friends who [Searles] recommended to Dr. Traub on Scott Burton's recommendation" and that "[i]t sounds like they all filled out a questionnaire provided by Dr. Traub and possibly none of them were actually seen."

In response, Fisher thanked Cowart, said he would call Doran, and asked Cowart why the prescriptions were sent to Georgia.  Here is the rest of the email exchange:

**Cowart**: "The address we shipped to was provided by Dr. Traub."

**Fisher**: "But what address did we verify with the patient, the Georgia address or the Virginia address?"

> **Cowart**: "We verified the Georgia address according to the notes.  I am checking the other patients I know to be those of Doran Fortune, and I have found a second one with the same Atlanta address.  Heather ran an ad hoc report, and it appears four out of Doran's 14 patients had meds shipped to the same . . . address in Atlanta.  I smell a fish.  Vicki."

> **Fisher**: "I know in the past we have sent medications for Dr. Traub's patients to an address of someone in his office so the patient can pick them up.  We'll have to figure out what is going on in this particular situation.  Let's not jump to conclusions until we have a chance to gather more info. Thank you."

There is no evidence that Fisher took any action.

Earlier in the trial, Burton testified that he told Fisher that Fortune had recruited many patients at a bachelor party.  An email listed the names of attendees, and Mark Searles was on the list.  According to Burton, Fisher's only concern with that list of patients was that they were from out-of-state, and Fisher told Burton to use an Atlanta address for them.

While unaware of the Burton-Hodgson scheme, several Physician Specialty Pharmacy employees testified to "gray area" pharmacy practices at Physician Specialty Pharmacy, with "gray area" meaning that the practices were not per se illegal.  But the employees believed those practices may have been part of a bigger scheme.  In fact, Cary McKnight testified that during a conversation about Physician Specialty Pharmacy's sales representatives, Fisher

said, "that he knew that the pharmacy is supposed to be black and white but that he liked to operate in the gray area."

One of these "gray area" practices was billing TRICARE for expensive ingredients. Claims for compound medications using different ingredients could vary widely. For example, if a compound cream used Lipoderm as the base, Physician Specialty Pharmacy could be reimbursed $580.47, while a similar base ingredient called Stera Base could be reimbursed for $3,368.16. Of course, making money is not illegal, but the government presented evidence that Fisher was singularly focused on maximizing profitability. For example, McKnight testified about discussions with Fisher about how to bill the most from insurance and how ingredients of some formulas changed over time to increase profitability. And, according to Burton, Fisher had a method for creating formulas that would pay the most from each insurance company. Physician Specialty Pharmacy would send out "trial reimbursement[s]" using different ingredients to see what would "get the maximum amount of reimbursement for each insurance company." Burton further testified that the draw of using Physician Specialty Pharmacy was that Fisher "had a system in place" to "get maximum reimbursements from each insurance company."

At trial, the government asked McKnight—former pharmacist-in-charge at Physician Specialty Pharmacy—about specific times a Physician Specialty Pharmacy formula changed to increase profitability. McKnight responded that Fluticasone "always comes to mind" because it was "a very expensive ingredient" used in scar

gels that "elevated the price" that Physician Specialty Pharmacy could bill the insurance companies.  He said that the pharmacy he worked at before Physician Specialty Pharmacy used .1 percent of Fluticasone in their scar gel, but Physician Specialty Pharmacy "changed to a full 1 percent Fluticasone, which was 10 times more than what we were using."  McKnight added that "[t]he pharmacist at the time questioned it because, according to them, it wasn't— the efficacy of increasing the Fluticasone was not beneficial.  But that is, again, between them and the doctor."  McKnight also testified that, although the pharmacists had input into the development of the compounded prescription formulas, Fisher had the final say in approving them.

Glen Hanson, the former pharmacist-in-charge at Physician Specialty Pharmacy, also testified that a scar cream formula was changed "because of the high reimbursement amount."  Hanson testified that Fisher, another pharmacist, and a sales representative went to Louisiana to find a different base that "would gross more money."  As a result of the trip to Louisiana, Physician Specialty Pharmacy switched from a cream base called Lipoderm to a more expensive base called Stera Base.  Though more expensive, Hanson testified that Stera Base was "a poor quality product" because it was runny and did not hold the ingredients together as well as the cheaper base.

Hanson testified that tension developed between him and Fisher over the formulas because Hanson was concerned about the quality of the product and Fisher was concerned with using

ingredients to increase profits. For example, when Fisher suspected that the pharmacists were not using Stera Base, he emailed Hanson, stating:

> One of the claims was a pain cream for 480 grams that reimbursed around 4,000. If we used and billed Stera Base, it should be twice that. Please check on these patients and make sure we used and billed Stera Base. If we did not bill Stera Base, please reverse and bill them utilizing a formula with Stera Base.

Hanson also testified to a disagreement over a decision by Fisher not to reverse an insurance claim after a customer had returned the product, which caused Hanson to resign.

In a voluntary interview with Vanessa Carmona—an agent of the Florida Department of Law Enforcement and a task force officer with the Federal Bureau of Investigation—Fisher told Agent Carmona that when he started Physician Specialty Pharmacy, he knew TRICARE was the "last reliable insurance company that paid for compounds." Agent Carmona testified that Fisher told her "whatever the maximum reimbursable amount was that he could get from the insurance company, that that's what he was going to charge." For example, "if it cost him $500 to make a prescription, but TRICARE was willing to pay $6,000, then he was going to bill that maximum amount for that prescription." Agent Carmona testified that Fisher "agreed that it was inflated, but he also said that . . . if they were willing to pay that much—'they' being like TRICARE, the insurance companies—then they were going to bill

the maximum that they were allowed to." Agent Carmona testified that Fisher said he "felt like he took advantage of" TRICARE's high reimbursement rates, but "stated several times that he felt like everything he did was within the law, and that he had not defrauded anybody."

The government also presented evidence that Fisher disregarded the pharmacy's duty to collect co-pays from the patients. Burton testified that "the co[-]pay part came up quite a bit" because "patients didn't want to pay the co[-]pay." Burton testified that "Fisher contacted [him] by phone" and told him "if you're having any issues with patients not wanting to pay or if your reps have issues or anybody dealing with these patients are getting a call, let the patients know that by law we have to bill the patients one time" and that "[i]f they don't pay their co[-]pay, we're not going to send them to collections, so just let them know they can throw that bill away, they don't need to pay it."

Cary McKnight also testified that Fisher was not concerned about co-pays and referenced an incident described in an email drafted by Fisher. A patient had balked at a $17 co-pay, and Fisher instructed McKnight to ship the medication and simply send an invoice and write the co-pay off if the customer continued to balk. According to McKnight, Fisher's philosophy was that: "if you got a $5,000 prescription, you're not worried about a hundred dollar co-pay." Burton testified that Fisher said something similar to him, i.e., that Fisher "didn't want to let a $10,000 reimbursement go away because somebody didn't want to pay a $17 co-pay."

Vicki Cowart's notes from work, which she read during her testimony at trial, indicated that she received similar instructions regarding co-pays, although she could not remember from whom. Cowart also referenced a procedure for "force fills," which she described as filling prescriptions without getting the patient's consent beforehand.

## F.  The Scheme Unravels

Eventually, Fisher started looking to purchase pharmacies to spread out Physician Specialty Pharmacy's billing as not to draw attention from the insurance companies.  He emailed Physician Specialty Pharmacy stakeholders, stating:

> [T]he main reasons we are looking into purchasing this pharmacy, in addition to it potentially being a good investment in and of itself is, one, so that we can expand our operations.  The insurance companies actively target pharmacies that bill over a certain amount per month, so having multiple pharmacies billing a lower amount each month is an ideal strategy for staying off their radar.  The second reason is because right now we are paying the pharmacy that we bill through around 13 percent of our gross sales. So for December, we basically paid them $390,000 to let us bill through their contracts. While I do appreciate their willingness to work with us, that is completely ridiculous, given that we do 99.74 percent of the work, and it is all of our business.

And, in February 2015, Fisher acquired Jay Pharmacy.

As it turns out, Fisher's fears were well founded. Eventually, Burklow Pharmacy, Jay Pharmacy, and Physician Specialty Pharmacy came under scrutiny from TRICARE's pharmacy benefits manager Express Scripts and the central payor, American Pharmacy Cooperative, because of extraordinarily high billings and a concern as to whether the doctor-patient relationships underlying the pharmacies' claims were legitimate.

In late 2014, an accountant from American Pharmacy Cooperative noticed a huge surge in Burklow Pharmacy's billing, rising from between $200,000 and $300,000 per month to $1 million. American Pharmacy Cooperative therefore withheld payments to Burklow Pharmacy from Express Scripts, and TRICARE suspended claim payments for all claims from Burklow Pharmacy.

Then, in March 2015, Fisher received notice that TRICARE would be initiating new screening procedures for compounded medication claims as of May 1, 2015, making it harder to bill for compounded medications. Fisher referred to this date as "D-Day" and, before that date, Fisher pushed to "bill as much as possible" and then to "refill as many of those as possible as 90-day supplies" before May 1. To implement his plan, Fisher sent a letter asking his doctors to sign authorizations for 90-day refills. For Dr. Traub, Fisher sent the letter to Burton. Hodgson forged Dr. Traub's signature and Burton returned the 90-day authorization to Fisher although there is no evidence that Fisher was aware of the forgery.

Because of Fisher's "D-Day" plan, billings skyrocketed in April 2015. By May 2015, Jay Pharmacy went from billing "around

$1500 per month" to billing "several million."  This drew the attention of American Pharmacy Cooperative, which placed a hold on Jay Pharmacy's TRICARE reimbursement checks in May 2015. American Pharmacy Cooperative returned Jay Pharmacy's entire payment to Express Scripts, and TRICARE later terminated its contract with Jay Pharmacy.  Express Scripts withheld the payment while it performed an audit on Jay Pharmacy.

Because Express Scripts was withholding payments, Fisher could not pay Burton or any other sales representatives for the commissions they were owed from those reimbursements.  On June 23, 2015, Fisher emailed Burton and other "[Physician Specialty Pharmacy] partners" explaining that American Pharmacy Cooperative was "still withholding our funds" while Express Scripts conducted an audit.  The email included a letter attachment addressed to Jay Pharmacy informing the pharmacy that Express Scripts planned to audit the pharmacy.

Express Scripts also began an audit on Burklow Pharmacy's claims for compound medications to determine whether they were based on doctor-patient relationships.  On October 23, 2015, Fisher received an email from a business associate forwarding an email originally sent to Steve Burklow with a letter attachment from the Office of the Assistant Secretary of Defense (the "DOD letter"). The DOD letter informed Burklow, as president of Burklow Pharmacy, that all "payment for present and future claims for services provided by you or your organization" would be suspended "due to you having dispensed compound drugs to TRICARE

beneficiaries based upon prescriptions written by physicians who may not have established a physician/patient relationship with the TRICARE beneficiary." The DOD letter stated that in the absence of a valid or appropriate doctor-patient relationship, a prescription is not valid, and therefore not reimbursable under TRICARE.

On November 17, 2015, in response to the DOD letter, Burklow's attorney sent out letter affidavits, asking Burklow and Fisher to have each doctor sign to attest that the prescriptions were based on legitimate doctor-patient relationships, in order to satisfy TRICARE.

Fisher and Burklow discussed the audit and the letter affidavits. Burklow testified that TRICARE "wanted affidavits from each doctor" to "establish the doctor/patient relationship" existed, and Burklow sent Fisher a letter to have his doctors sign. Burklow testified that he told Fisher why he needed the letters and specifically told him that TRICARE was concerned about a lack of doctor-patient relationships.

Fisher sent the letter affidavit to Burton for Dr. Traub to sign, accompanied by an email explaining the letter affidavit. In that email, Fisher informed Burton that Burklow Pharmacy was being audited by TRICARE and needed to verify the doctor-patient relationship and assured Burton that this was nothing to be alarmed about. The letter affidavit attached to the email read:

> My name is Dr. Jeff Traub. I am a licensed and practicing physician in the state of Georgia. As a treatment for my patients, I have written compounding

prescriptions.  In all cases, *I personally met with each patient for whom I wrote a prescription.*  I evaluated every patient for whom I wrote a compounding prescription based on my professional expertise.  It is absolutely and equally true that I only wrote and write prescriptions for patients with whom I had properly established a physician-patient relationship.  More specifically, it is my understanding that some compounding prescriptions for my patients covered by TRICARE were submitted to TRICARE or its processing agents by Burklow Pharmacy.  Any prescription written by me and submitted by Burklow Pharmacy was done in all cases for patients with whom I had established a proper physician-patient relationship.

(Emphasis added).

Burton testified that Fisher called Burton before sending the letter affidavit for Dr. Traub to sign, and Fisher explained that if Burton wanted to receive the commissions that were being withheld, he would have to get the letter signed.[7]  Burton testified that he told Fisher that he would send the letters, but that Dr. Traub

---

[7] Burton testified that it was common for Fisher to call him before or after Fisher emailed.  Burton said Fisher would call "[t]o clear up things before he sent the email over" because "[u]sually the email, you know, it was going to be a little bit different than what we talked about" because Fisher would not want to put certain things in writing.

might not sign the letter because he had not personally seen the patients.

Burton sent the letter affidavit to Hodgson, who signed and returned it to Burton. At trial, Hodgson testified that the statement attesting that Dr. Traub had authorized all prescriptions based on a proper doctor-patient relationship was not true. Nonetheless, Burton sent the signed letter affidavit back to Fisher with an email stating, "Hope this helps. All my docs prescribed these meds to their patients who legitimately needed them. They have files on all their patients. So this info should help us get the money we are owed." Burton testified that the email was a lie, and that Fisher knew it was not true. However, even Burton said that he thought Dr. Traub signed the letter.

In December 2015, Fisher voluntarily sat for an interview with Agent Carmona. During the interview, Fisher explained that he opened Physician Specialty Pharmacy because he knew there was a lot of money to be made in the compounding pharmaceutical business. He acknowledged that the insurance reimbursement rates had created an inflated system, and, as previously noted, he admitted that he took advantage of that system.

In that interview, Fisher said that Physician Specialty Pharmacy entered a central fill agreement with Burklow Pharmacy because Burklow Pharmacy was understaffed and needed help. According to Fisher, Burklow Pharmacy would forward prescriptions to Physician Specialty Pharmacy by fax, and Burklow Pharmacy was responsible for collecting the co-pays, although Physician

Specialty Pharmacy would invoice the co-pays.  Fisher told Agent Carmona that Physician Specialty Pharmacy stopped dealing with Burklow Pharmacy in April or May 2015 because Burklow Pharmacy lost its contract with TRICARE.  Fisher claimed he did not know why Burklow Pharmacy  lost the contract, even though he received the DOD letter and email almost two months before the interview.

According to Agent Carmona, Fisher also contradicted himself during the interview.  For example, at one point Fisher told Agent Carmona that Physician Specialty Pharmacy's sales representatives *did not* recruit patients, but in the same interview he also told Agent Carmona that Physician Specialty Pharmacy used sales representatives to market to TRICARE patients—i.e., "the last reliable insurance company that paid for [Fisher's] compounds."

In February 2016, law enforcement executed a federal search warrant at Physician Specialty Pharmacy.  Law enforcement also obtained Physician Specialty Pharmacy's emails and bank records, as well as records from Dr. Traub's office.  At trial, Suzanne Reyenga, a forensic accountant with the FBI, testified concerning a financial analysis of these records.  Reyenga testified that, from October 2014 to August 2015, American Pharmacy Cooperative paid $19.5 million to Burklow Pharmacy.  Burklow Pharmacy transferred $16.3 million, of that $19.5 million, to Physician Specialty Pharmacy, and Physician Specialty Pharmacy paid approximately $8.3 million in commissions to various sales representatives.  Of the total commissions paid, Physician Specialty Pharmacy

transferred approximately $2 million to Simply Surgical—Burton's company.  Reyenga further testified that, on several occasions, Physician Specialty Pharmacy transferred more than $10,000 to Burton's account, specifically for prescriptions from Dr. Traub.

Special Agent Paul Tarnuzzer of the Department of Defense, Criminal Investigative Service, testified about Dr. Traub's patient files and pharmacy records.  Agent Tarnuzzer identified several TRICARE beneficiaries who were not actual patients of Dr. Traub, but whose demographic information had been submitted by Burton and his sales representatives for a prescription and for TRICARE reimbursement.  In fact, Tarnuzzer identified only twelve prescriptions for actual patients of Dr. Traub.  Agent Tarnuzzer testified that the total amount TRICARE paid to Burklow Pharmacy alone, on claims for prescriptions written by Dr. Traub, was approximately $3.3 million.  In total, between October 20, 2014 and June 30, 2015, TRICARE was billed approximately $6.2 million, and paid approximately $4.8 million, on prescriptions submitted in Dr. Traub's name by Burton and his representatives.

## G.  Fisher's Defense at Trial

In his defense, Fisher presented the testimony of three Physician Specialty Pharmacy employees to show the normal business operations at Physician Specialty Pharmacy: pharmacist Thomas Wiley; patient care specialist April Ryan; and marketing coordinator Kylie Hunt.

Fisher originally hired Thomas Wiley in December 2014 as a "knowledge pharmacist" to help educate the sales representatives on Physician Specialty Pharmacy's products and formulas. Wiley also filled in as a pharmacist sometimes, and in May 2015, Fisher promoted him to vice president of pharmacy operations. Wiley testified that he, and all of the other pharmacists at Physician Specialty Pharmacy, had input into developing the Rx pads: "The pharmacists always would get together and approve any new prescription pad that was presented to us . . . to review it, to make sure there are no errors, there are no therapy mistakes, no directions that are wrong, before we send it out." He testified that a pharmacist at Physician Specialty Pharmacy signed off on every prescription, meaning that the pharmacist was "approving that prescription as being safe and effective for the patient's condition." Wiley also testified that Fisher never pressured him or any pharmacist to "use a formula or ingredient that [the] pharmacist[] was not comfortable with."

Patient care representative April Ryan began working for Physician Specialty Pharmacy in December 2014. She testified that Physician Specialty Pharmacy confirmed prescriptions, verified patient demographic information, and "if there was something that looked to be untruthful or that it was deceitful in any way, then we would not proceed with that prescription." She stated that the pharmacy records showed that more than twenty percent of the Dr. Traub prescriptions were refused (188 were refused out of 925

prescriptions), with notations such as insurance denied, patient denied, patient could not be reached, or unlicensed state.

Physician Specialty Pharmacy marketing coordinator Kylie Hunt started in April 2015. In an attempt to rebut the government's argument that Fisher did not collect TRICARE co-pays from patients, Hunt testified that according to a 2015 accounts receivable report, Jay Pharmacy, which was then owned by Fisher, collected co-pays from TRICARE beneficiaries. But, as the government pointed out on cross-examination, the earliest co-pay related entry on the report was July 30, 2015.

In his closing argument, Fisher argued that the government failed to prove that he knowingly and willfully joined a health care fraud conspiracy, wire fraud conspiracy, or money laundering conspiracy with Burton. Fisher maintained that Burton's testimony was not credible, that he was unaware of Hodgson's forgery, that the "gray area" pharmacy practices were not unlawful, and that his voluntary interview with investigators showed his lack of willful intent to join Burton's conspiracy.

## H. Jury Instructions, Deliberations, and Verdict

On the final day of trial, the district court and counsel reviewed the proposed jury instructions and the verdict form. The district court gave the initial portion of its instructions to the jury before the parties gave their closing arguments and gave the rest of its instructions after closing arguments. After the court provided the jury with all of its instructions, and before the jury retired to

deliberate, the district court asked counsel if there was "any objection to the instructions as delivered by the Court to the jury." The government responded: "None from the government." The court then specifically asked for Fisher's two attorneys by name for their response. One of the attorneys, Mr. Feldman, responded: "No objection, Your Honor." In other words, the defense did not object either to constructive amendment of the indictment or inadequacy of the instructions.

Following five days of trial, the jury retired to deliberate. During deliberations, the jury sent one communication to the Court, asking whether it is health care fraud to send a prescription to a third party in a licensed state with the understanding that the prescription will be forwarded to a patient in an unlicensed state. The district court answered, "No," and stated that "those facts would not, in and of themselves constitute conspiracy to commit health care fraud," and cautioned the jury that the court could not comment on the evidence.

Following deliberations, the jury returned a verdict of "guilty" on both counts. Fisher was sentenced to 24 months' imprisonment and ordered to forfeit $4.8 million to TRICARE. Fisher timely appealed the jury verdict, the order of forfeiture, and the sentence, arguing the evidence produced at trial was insufficient to support his convictions and that his indictment was constructively amended in violation of his Fifth Amendment rights.

## II.     STANDARD OF REVIEW

We review the sufficiency of the evidence to support a conviction de novo, "viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences and credibility choices in the verdict's favor." *United States v. Grow*, 977 F.3d 1310, 1320 (11th Cir. 2020) (quoting *United States v. Deason*, 965 F.3d 1252, 1262 (11th Cir. 2020)). "We may not overturn the jury's verdict 'if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Estepa*, 998 F.3d 898, 908 (11th Cir. 2021) (quoting *United States v. Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013)). "To support a conviction, '[t]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial.'" *Id.* (quoting *Capers*, 708 F.3d at 1297).

We generally review de novo "an alleged constructive amendment of the indictment." *United States v. Feldman*, 931 F.3d 1245, 1253 (11th Cir. 2019). But when a defendant fails to object to an alleged constructive amendment in the case below, we review only for plain error. *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015). And "[w]hen a party agrees with a court's proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." *Grow*, 977 F.3d at 1330 (quoting *United States v. Frank*, 599 F.3d 1221, 1240 (11th Cir. 2010)).

## III.    ANALYSIS

Fisher asks this court to overturn his convictions for two reasons. First, Fisher argues the evidence was insufficient to sustain his conspiracy convictions. Second, Fisher argues that the district court's jury instructions amounted to a constructive amendment of the indictment. We address Fisher's arguments in turn.

## A. Sufficiency of the Evidence

Fisher was convicted and sentenced for conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347, 1349; conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349; and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1957. On appeal, Fisher contends that the government's evidence was insufficient to sustain his conspiracy convictions because there was no evidence that he knew that Dr. Traub's prescriptions were fraudulent.

The crime of health care fraud is defined by 18 U.S.C. § 1347. Section 1347(a) makes it a crime to

> knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice-- (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items or services.

Under 18 U.S.C. § 1349, it a crime to "attempt[] or conspire[] to commit any offense under this chapter," including health care

fraud. "[T]o sustain a conviction for conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349 . . . , the [g]overnment had to establish beyond a reasonable doubt that: (1) a conspiracy existed to commit health care fraud under 18 U.S.C. § 1347; (2) [Fisher] knew of the conspiracy; and (3) [Fisher] knowingly and voluntarily joined it." *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016). Specifically, the government had to establish that Fisher knew the claims he submitted to TRICARE were fraudulent. *Id.* (citing *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007)). As Fisher argues, "[t]he principal issue at trial was," and the principal issue on appeal is, "whether Fisher knew what Burton was doing; that is, did Fisher know that the prescriptions were fraudulent."

"Because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." *United States v. Abovyan*, 988 F.3d 1288, 1302 (11th Cir. 2021) (quoting *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998)). Indeed, "[g]uilty knowledge can rarely be established by direct evidence, especially in respect to fraud crimes which, by their very nature, often yield little in the way of direct proof." *United States v. Clay*, 832 F.3d 1259, 1309 (11th Cir. 2016) (quoting *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998)). A defendant can be found guilty of participating in a conspiracy "if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have

direct contact with other alleged co-conspirators, or did not partic-
ipate in every stage of the conspiracy." *Abovyan*, 988 F.3d at 1302–
03 (quoting *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir.
2015)); *see also United States v. Reeves*, 742 F.3d 487, 497–98 (11th
Cir. 2014).

Viewing the evidence in the light most favorable to the ver-
dict, and based on both the direct and circumstantial evidence de-
scribed below in this case involving a conspiracy to commit health
care fraud, we hold that a reasonable jury could find beyond a rea-
sonable doubt that: (1) Fisher knew of the conspiracy, and (2)
Fisher knowingly and voluntarily joined the conspiracy by submit-
ting claims to TRICARE that he knew were fraudulent.[8]

---

[8] While Fisher purportedly appeals all three of his conspiracy convictions, the
arguments in his brief to this Court only focus on his claim that there was
insufficient evidence to support his conviction for conspiracy to commit
health care fraud. Turning to these other conspiracy convictions, the elements
of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, are: (1)
that a conspiracy to commit wire fraud existed; (2) that the defendant knew of
it; and (3) that the defendant knowingly and voluntarily joined it. *Feldman*,
931 F.3d at 1257. In turn, the elements of conspiracy to commit money laun-
dering, in violation of 18 U.S.C. § 1956(h), are "(1) an agreement between two
or more persons to commit a money-laundering offense; and (2) knowing and
voluntary participation in that agreement by the defendant." *United States v.
Iriele*, 977 F.3d 1155, 1174 (11th Cir. 2020) (quoting *United States v. Feldman*,
936 F.3d 1288, 1307 (11th Cir. 2019)). Relevant to Fisher's money laundering
conspiracy conviction, money laundering offenses include "the use of a finan-
cial institution to conduct a monetary transaction involving more than $10,000
of illegally obtained funds." *Id.* at 1173 (citing 18 U.S.C. § 1957).

### 1. *Direct Evidence from Burton's Testimony*

At trial, the most direct evidence of Fisher's knowledge was Burton's testimony that Fisher knew the Dr. Traub prescriptions had no doctor-patient relationship behind them. Burton, the orchestrator of the conspiracy, testified that he told Fisher in their initial call that Dr. Traub "didn't actually see the patients" for which the prescriptions were written. Fisher responded that "as long as it's not a problem with the surgeon, I have no problem with it." Burton also testified that he discussed "the fact that these prescriptions didn't have a real doctor/patient behind them" with Fisher "[m]any times," and told Fisher that one of Burton's sales representatives recruited patients at a bachelor party.

On appeal, Fisher claims Burton's testimony is insufficient for two reasons: (1) there was no evidence Fisher knew about Hodgson's role in the scheme and "the essence of the government's case was that Fisher supposedly knew all along that Dr. Traub was oblivious to the scheme that Hodgson and Burton were perpetrating"; and (2) the government presented no evidence of

---

Again, Fisher's arguments on appeal only pertain to whether he conspired to commit health care fraud. But even presuming that Fisher meant to argue that all three of his convictions should be overturned because he did not know of the Burton-Hodgson conspiracy, or because he did not knowingly and voluntarily join it, there was sufficient evidence to prove that he did for the same reasons we find that there was sufficient evidence to convict him for conspiracy to commit health care fraud. Therefore, we need not separately address the sufficiency of the evidence supporting his other convictions, as our analysis would be the same.

what constitutes a valid doctor-patient relationship, and under Georgia law, it is possible to establish a doctor-patient relationship without seeing the patient. Both arguments are unpersuasive.

First, it does not matter that Fisher did not know about Hodgson's role in the scheme. "[A] defendant can be convicted of conspiracy if the evidence demonstrates that he was aware of the conspiracy's essential nature, even if he did not know all of its details, played only a minor role in the overall scheme, did not have direct contact with other alleged co-conspirators, or did not participate in every stage of the conspiracy." *Abovyan*, 988 F.3d at 1302–03 (quoting *Sosa*, 777 F.3d at 1290). Here, the essential nature of the scheme was submitting prescriptions to TRICARE that were not made pursuant to a licensed practitioner's determination that the prescriptions were medically necessary. And a reasonable jury could have construed Burton's testimony to mean that Fisher was comfortable joining the scheme because Fisher thought a dishonest doctor, rather than a dishonest doctor's assistant, was on board with it and willing to write prescriptions without having a doctor-patient relationship. *See Estepa*, 998 F.3d at 908 ("We may not overturn the jury's verdict 'if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" (quoting *Capers*, 708 F.3d at 1297)).

Second, as to Fisher's argument that it was possible for Dr. Traub to establish a valid doctor-patient relationship through remote consultations without actually seeing the patients, "it is not necessary that the evidence exclude every reasonable hypothesis of

innocence or be wholly inconsistent with every conclusion except that of guilt" because "a jury is free to choose among the reasonable constructions of the evidence." *United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020) (quoting *United States v. Godwin*, 765 F.3d 1306, 1320 (11th Cir. 2014)).  And one reasonable construction of the evidence at trial was that Dr. Traub had *no relationship at all* with the relevant TRICARE patients.  For example, Burton testified that Burton discussed "the fact that these prescriptions didn't have a real doctor/patient relationship behind them" with Fisher "[m]any times," and that he told Fisher that one of his sales representatives recruited "patients" at a bachelor party.  In hearing testimony that Fisher was told "[m]any times" that Dr. Traub didn't have a real doctor-patient relationship with the relevant patients, and that some of these patients were recruited to be patients at a bachelor party, the jury was "not required to put aside its common sense or to assume that [Fisher] ha[d] none."[9] *United States v. Hill*, 643 F.3d 807, 863 (11th Cir. 2011).  We now turn to the circumstantial evidence presented at trial.

---

[9] Common sense also refutes Fisher's argument that, because Fisher was not a doctor or a pharmacist, he could not have been expected to know what was necessary to establish a legitimate doctor-relationship. *Cf. Gonzalez*, 834 F.3d at 1216 ("Gonzalez's lack of formal nursing or medical training would not have affected her ability to recognize the suspicious nature of the activities in which she was engaged.").  Fisher's argument is also undercut by the circumstantial evidence discussed in Section III(A)(2).

## 2. *Circumstantial Evidence*

"It is well settled that the government may prove a conspiracy through circumstantial evidence or inferences from the defendant's conduct." *Abovyan*, 988 F.3d at 1303.  Here, circumstantial evidence also supported the verdict. This circumstantial evidence as discussed below included Fisher's "gray area" pharmacy practices, his conduct surrounding the letter affidavits, his (lack-of) response to Cowart's alerting him to suspected fraud, and the evidence elicited at trial that he was trying to cover up the scheme. We first address the gray area practices.

### i. Gray Area Practices

While not illegal in and of themselves, a reasonable jury could view Fisher's "gray area" pharmacy practices as showing Fisher's willingness to profit off of TRICARE at any cost.  For example, the government presented evidence that Fisher did not enforce the co-pay requirement if collecting a co-pay would put the ability to bill TRICARE for the prescription in jeopardy.  And Fisher admitted to Agent Carmona that he "took advantage" of TRICARE's high reimbursement rates by charging as much as he could, even though he admitted those costs were "inflated."

Fisher argues that evidence of his lax co-pay policies and use of expensive ingredients was insufficient to sustain his conviction. But Fisher concedes that "[t]here was evidence at trial that certain practices of [Physician Specialty Pharmacy] violated various regulatory requirements and policy manuals of TRICARE and [Express

Scripts]." And, in addition to other evidence demonstrating that Fisher knew of, and knowingly and voluntarily joined, the relevant conspiracy, a reasonable jury could infer that Fisher's "gray area" pharmacy practices are consistent with an intent to defraud TRICARE and to maximize his profits from so doing.

### ii. The Letter Affidavit

The evidence at trial showed that Fisher also sent a letter affidavit to Burton for Dr. Traub to sign, which stated, in relevant part: "My name is Dr. Jeff Traub. . . .  As a treatment for my patients, I have written compounding prescriptions. *In all cases, I personally met with each patient for whom I wrote a prescription.*" (Emphasis added).  And in connection with this letter, Burton testified that Fisher knew Dr. Traub did not meet with each patient. Nonetheless, Fisher returned the letter affidavit to Burklow's attorney to submit to Express Scripts.  A reasonable jury could conclude that this evidence suggested that Fisher knowingly participated in the conspiracy and that he knowingly tried to ensure that the scheme would continue without detection.

### iii. Fisher's Response to Report of Suspected Fraud

The evidence presented at trial also showed that Fisher did not act when Cowart reported a patient's complaint of suspected fraud, or when Cowart told Fisher that she suspected that several patients simply filled out questionnaires provided by Dr. Traub and were never actually seen by the doctor.  A reasonable jury could infer that Fisher did not investigate the suspected fraud because he

already knew of the fraudulent scheme and that Dr. Traub had not seen the relevant patients. That inference is even more reasonable given other testimony at trial that the patient who complained of suspected fraud was one of the patients that was recruited at a bachelor party.

### iv. Evidence of Cover-Up

We now turn to the circumstantial evidence elicited at trial regarding a cover-up. A reasonable jury could view Fisher's decision to buy Jay Pharmacy, and Fisher's inconsistent statements to Agent Carmona, as attempts to cover-up his role in the conspiracy.

McKnight—the operations manager of Physician Specialty Pharmacy—testified that Fisher purchased Jay Pharmacy in part to spread out high insurance billing and because "being a small pharmacy, it probably wouldn't draw a lot of attention . . . "[f]rom the insurance companies." A reasonable jury could conclude that McKnight's testimony, in combination with an email Fisher sent about wanting to purchase other pharmacies because "insurance companies actively target pharmacies that bill over a certain amount per month, so having multiple pharmacies billing a lower amount . . . is an ideal strategy for staying off their radar," suggested that Fisher knew of the conspiracy to defraud TRICARE and that he attempted to conceal it.

Fisher also made inconsistent statements to Agent Carmona, which a reasonable jury could view as an attempt by Fisher to cover up his role in the conspiracy. For example, Fisher told

Agent Carmona that he did not know why Burklow Pharmacy lost its contract with Express Scripts, even though the evidence at trial demonstrated that Fisher received the DOD letter two months earlier. He also stated to Agent Carmona that his sales representatives did not recruit patients, but Fisher later told Agent Carmona that his sales representatives did market directly to TRICARE beneficiaries.

★ ★ ★ ★

Based on this record, our decisions in *United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020), and *United States v. Chalker*, 966 F.3d 1177 (11th Cir. 2020), support our conclusion that there was sufficient evidence to support the verdicts in this case.

The scheme in *Grow* involved TRICARE patients recruited to receive "pain creams, scar creams, and vitamins that were not medically necessary." 977 F.3d at 1321. The defendant, Grow, owned a marketing company that employed sales representatives to recruit TRICARE beneficiaries to receive compound medications from the pharmacy he worked with. *Id.* at 1314–15. Grow would forward patient information to a telemedicine company, which would arrange for a doctor to "conduct a brief consult—typically between five and seven minutes, but sometimes as short as three minutes—and prescribe [the pharmacy's] creams and vitamins." *Id.* at 1315. Once a doctor issued a prescription, the telemedicine company would fax it to Grow, who would then fax it to the pharmacy to fill. *Id.* The pharmacy would mail the

prescriptions to the patient and submit a claim for reimbursement. *Id.* The pharmacy would charge the patients a co-pay, but Grow told the patients they did not need to pay their co-pays because the pharmacy would never collect on them. *Id.* If the pharmacy did seek to collect the co-pay, Grow told his representatives they could pay the co-pay on the patient's behalf. *Id.*

In connection with the above-described scheme, Grow was convicted for, among other things, conspiracy to commit health care and wire fraud. *Id.* at 1320. Grow appealed his conviction on the basis that the evidence was insufficient to support the verdict. *Id.* We upheld Grow's conviction for conspiracy to commit health care fraud because there was sufficient evidence to support the conviction, including "sufficient evidence of Grow's knowledge of the fraud and his intent to defraud." *Id.* at 1322.

Like Fisher, the evidence showed that Grow pushed the pharmacy to use a premium ingredient in its compound medications that was vastly more expensive but otherwise identical to the regular ingredient. *Id.* at 1323. This Court determined that "a jury could reasonably conclude that Grow and [the pharmacy] used [the expensive ingredient] for no other reason than to fraudulently inflate Tricare's reimbursement rates." *Id.* at 1324; *see also United States v. Melgen*, 967 F.3d 1250, 1255, 1263 (11th Cir. 2020) (rejecting sufficiency of the evidence challenge because there was sufficient evidence of the defendant's "motive and means for fraudulently billing [an insurance company] for an expensive drug" and

the defendant "only rarely prescribed" the equivalent, less expensive drug).

Like Fisher, Grow profited from the fraud. *Grow*, 977 F.3d at 1324. As we have explained, "[e]vidence that the defendant profited from a fraud may . . . provide circumstantial evidence of the intent to participate in that fraud." *United States v. Machado*, 886 F.3d 1070, 1083 (11th Cir. 2018). As such, this Court concluded that "a reasonable jury could find an intent to defraud from the money Grow made from billing [TRICARE] for creams and vitamins that were not medically necessary." *Grow*, 977 F.3d at 1324. And, like Fisher, there was evidence from which a reasonable jury could find "that Grow and [the pharmacy] were trying to conceal the fraud scheme." *Id.* at 1325. For example, Grow would remove his fax number from the prescriptions he submitted to the pharmacy because only doctors were allowed to submit prescriptions to the pharmacy. *Id.* at 1324–35. Moreover, when Grow became concerned that there might be an issue with having a pharmacy paying commissions to independent contractors because it would violate the anti-kickback statute, Grow and the pharmacy decided that "everybody had to become W-2 employees." *Id.* at 1325; *see also United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (noting that intent to defraud "can be inferred from efforts to conceal the unlawful activity"). Given the similarities between the evidence in the two cases, here, like in *Grow*, we conclude that the evidence was sufficient to support the jury's verdict.

Our decision in *United States v. Chalker*, 966 F.3d 1177 (11th Cir. 2020) also supports our holding. The scheme in *Chalker* involved submitting fraudulent claims to Medicare, Medicaid, and TRICARE for reimbursement. *Id.* at 1182. Chalker was the pharmacist-in-charge of a pharmacy in Florida. *Id.* The pharmacy, "with Chalker at the helm, filled medically unnecessary prescriptions for patients who neither wanted nor needed them." *Id.* at 1185. Chalker was convicted by a jury for, among other things, conspiracy to commit health care fraud. *Id.* at 1182. Chalker challenged his conviction, among other grounds, on the basis that the evidence was insufficient to support the verdict. *Id.* We upheld the verdict because the government "introduced more than enough evidence to establish that Chalker knowingly and voluntarily participated in the conspiracy." *Id.* at 1187.

Similar to Burton's testimony about Fisher's role in the fraud, Chalker's co-conspirator "admitted that he had conspired with Chalker to commit health-care fraud." *Id.* And, just as Fisher's employees testified, Chalker's co-conspirator testified that the pharmacy "had a very lax view on co[-]pays and would waive them quite often." *Id.* (internal quotation marks omitted).

Similar to Fisher's trial system for creating formulas that would obtain higher reimbursements, "Chalker engaged in test billing: he 'would test run different formulations with the insurance companies to see what was covered, what was not covered, if it was covered, what was the net profit, and if [it] wasn't high enough, we would still try to find other formularies that would

46                     Opinion of the Court                     21-11879

reimburse higher.'" *Id.* And just as Fisher submitted the letter affidavit for the Burklow Pharmacy audit, knowing Dr. Traub had not personally seen all of the patients, Chalker sent a recertification agreement to a pharmacy benefits manager stating that no owner of the pharmacy had faced criminal prosecution for fraud, knowing that it was untrue. *Id.* at 1188.

"A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty." *Melgen*, 967 F.3d at 1263 (quoting *Capers*, 708 F.3d at 1297). For the reasons discussed, we hold that there was sufficient evidence to allow the jury to find Fisher guilty of conspiracy to commit health care fraud. Because Fisher relied on his arguments for overturning his health care fraud conspiracy conviction to overturn his other convictions, we need not separately address them. *See supra* n.8.

## B.  Constructive Amendment

On appeal, Fisher also argues that the district court's failure to limit the jury's consideration of the alleged means of accomplishing the conspiracy amounted to approving a constructive amendment of the indictment. Specifically, Fisher contends that the admission of the "gray area" evidence at trial amounted to a constructive amendment of the indictment and, therefore, the district court should have provided a limiting instruction to the jury.[10]

---

[10] The indictment alleged that Fisher conspired to seek reimbursements from TRICARE for fraudulent prescriptions, sought reimbursements for

"The Fifth Amendment guarantees that a defendant can be convicted only of crimes charged in the indictment." *Holt*, 777 F.3d at 1261. A constructive amendment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment." *Id.* (quoting *United States v. Narog*, 372 F.3d 1243, 1247 (11th Cir. 2004)). "The indictment can be expanded, either literally or in effect, by the prosecutor's actions or the district court's instructions." *Id.*

"A constructive amendment 'is per se reversible error.'" *Id.* (quoting *Narog*, 372 F.3d at 1247 (italics omitted)). But even if Fisher's constructive amendment argument has merit, Fisher waived this argument. Fisher failed to raise this argument when the court charged the jury, instead waiting until his post-verdict motion for acquittal and new trial. Generally, we review an unpreserved constructive amendment claim only for plain error. *See United States v. Maradiaga*, 987 F.3d 1315, 1322–23 (11th Cir. 2021); *Holt*, 777 F.3d at 1261. But "when a party agrees with a court's

---

prescriptions while not seeking to enforce the co-pay requirement that was part of the TRICARE contract, and directed his employees to use needlessly expensive ingredients in compound medications to maximize the reimbursements Fisher's pharmacy could bill to TRICARE. At trial, the government also presented evidence of Physician Specialty Pharmacy's: (1) out-of-state sales of compound medications; (2) delivery of medications to Burton's home address in Georgia for patients located out-of-state; (3) use of force-fill orders; (4) failure to reimburse for returned medications; (5) seeking 90-day refills; and (6) unconventional central fill set-up with Burklow Pharmacy.

proposed instructions, the doctrine of invited error applies, meaning that review is waived even if plain error would result." *Frank*, 599 F.3d at 1240. On the last day of trial, before dismissing the jury to deliberate, the district court asked whether Fisher objected to the jury instructions, to which his attorney responded, "No objection, Your Honor." Fisher has therefore waived his right to challenge this argument on appeal. *Cf. United States v. Fulford*, 267 F.3d 1241, 1247 (11th Cir. 2001) ("[H]aving agreed to the court's proposed instruction, Gage appears to have waived his right to challenge that instruction on appeal."). Because Fisher invited the error, we need not address the merits of his argument.

## IV.    CONCLUSION

For all these reasons, we hold that the government presented sufficient evidence to support Fisher's conspiracy convictions and that Fisher waived review of his constructive amendment argument. We therefore affirm Fisher's convictions for conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347, 1349; conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343, 1349; and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1957, as well as the corresponding sentence and order of forfeiture.

**AFFIRMED.**